We have two argued cases this morning. The first is number 18-1777, Pabst Licensing v. Samsung. Mr. Donoghue. Thank you for having us here today. The inventive concept of the 437 patent at its core really relates to the interplay between two limitations, the automatic file transfer process limitation and the automatic recognition process limitation. And what they basically, the 437 basically says is when a host, excuse me, when an interface device is attached to a host computer, the interface device, though it isn't a hard drive, represents itself through an identifier to the host and says that it's a hard drive, even though it is not, and then the host treats it as if it was a hard drive, even though it isn't, for purposes of file transfer and other communications using the customary driver associated with the hard drive. Now, the very key important point here that I need to make is that the 437 patent for both the automatic recognition process and for the file transfer process prohibits end user software from being loaded onto the device, onto the host device to assist in either identification or in file transfer. It says without wiring. It doesn't say prohibits, right? That's correct and that's the claim construction issue that is before the court today, or at least potentially if we can take that up, and if you'd like, I'd take that up now. We have this issue of collateral estoppel here, and if I, I've read the parties' briefs obviously, but it seems to me the two of you are directing yourself to different issues. You're directing yourself to the issue of whether the claims are patently indistinct from a claim which was invalidated or held unpatentable in the other IPRs, whereas the petitioner here is not really making that argument. Instead, they're saying they're sort of sub-arguments that are collateral estoppel from the other IPRs, and of course we can have collateral estoppel at both levels, both at the overall level of patent, unpatentability and also with respect to specific issues in the case. And what they're saying, I understand it, is that the claim construction issue with respect to without requiring was resolved in the earlier IPRs, and that the question of whether ATEC or whatever it is satisfies that limitation was also resolved against you in the earlier IPRs. So, could you address that? Sure. Well, as an initial matter, I don't think collateral estoppel applies on any level here. Why is that? Because there's a line of cases from the Federal Circuit, for example, the Cygnus case that we cited in our brief, that says that when it doesn't make sense from a collateral, it doesn't further the goals of a collateral estoppel, and it doesn't result in judicial economy, you wouldn't apply collateral. They're not that broad. Cygnus was a case about actual formal consolidation, and that didn't happen here. In fact, they were largely on the same timing track, not quite, and they were not formally consolidated. Yes, Your Honor, that's correct. That involved a multi-district litigation, and of course there was an adverse invalidity finding, and the defendants attempted to apply collateral estoppel to the settled-out, using the settled-out defendants' decision. Right, and it's long-standing law that you need an actual separate case for collateral estoppel, so intracase stuff doesn't count. Correct, but what's happened here is obviously these were all consolidated for purposes of Why is that sufficient, to preclude collateral estoppel? I mean, that's happened in some of our other cases, hasn't it? Well, it has, and in fact there's a World's case that came out very recently that appears to be mindful of that fact, that in the IPR setting this is becoming more of an issue because you typically have multiple IPRs and multiple patents in a patent family that are along the same time frame, and oftentimes the patent owner, for sake of streamlining issues for the court and for the sake of judicial economy, elects not to appeal certain decisions while it appeals other ones. And what happened in the World's case was that there were We did not decide the question in the World's. We remanded, stating two things. One, that it wasn't entirely clear that it was actually the same issue there, because it had to do with certain contract relations that might change whether there was a real party in interest. And then we said, partly for that reason, we're going to remand, and on the remand the board should consider that, and should also consider any other reason that might fall into restatement of judgments 28, or Cygnus-type considerations, why there might not be. So that's not really an answer to the question, it's just an identification of the question. That's correct, Your Honor. It hasn't been finally decided by this Court. What's the difference between this case and Max Linear? Well, in this case, again, because the decision, because collateral estoppel is an equitable doctrine, what we're saying here is that But I'm asking you to distinguish Max Linear. There were co-pending cases there, which we held would be collateral estoppel. But I think, if I believe, if I remember Some of them were resolved adversely. So I need to, I need to grab the Max Linear case, I'm sorry. Okay, so the Max Linear case involved a situation in which the dependent claims of, it was the same patent, and there were independent claims that were invalidated, and then the dependent Why is that a distinction? There were co-pending cases, some of them were decided, and they were held to be collateral estoppel on the remaining cases. And we specifically said it doesn't make any difference that they were co-pending. So my understanding of the Max Linear case was that because the issues of patentability were, the overlap in the claim language was such that it was, it was so substantially identical that there were no material differences. But you're talking about the merits of the thing. I'm talking about whether the doctrine of collateral estoppel applies, and we said that it did. But nobody brought up, I believe, the issue of the Cygnus case in that particular proceeding. Well, we addressed the question, we said the fact that they're co-pending doesn't mean that there's no collateral estoppel. But what else? I think that's true. It's not necessarily the case. It's true that just because they're co-pending, it's an equitable doctrine. You can consider whether or not, under the facts of any particular case, whether or not it makes sense. Max Linear doesn't say that, and I don't know what other case it says that you consider on the facts of the individual case, whether the policy is fine or not. Well, I believe that's what Cygnus is talking about, is that it doesn't further the goals of collateral estoppel to not give the patent owner the first bite of the apple, to begin with, when they streamline a case. And you don't want to encourage judicial inefficiencies by forcing any... Well, all you had to do was to get a stipulation from the other side that the dismissal wouldn't have collateral estoppel effect. You didn't ask for that, and you didn't get it. Well, yes, Your Honor, but I believe that the issue was that nobody believed collateral estoppel would apply here, A, because of the differences in the claim language that we did brief, and B, because it's an equitable doctrine, and it seems to me that it would be patently unfair to apply collateral estoppel in this instance. It's hard to say nobody believed. I mean, it took about four seconds for the other side to file their – to raise the issue. Well, they did raise the issue, and I believe they did it to complicate this case, whereas we were trying to streamline it. I think they were trying to inject those... Complicate the case? I think they did it to win the case. They're entitled to do that. But going back, let's assume that collateral estoppel does apply. Sure. Do you have any argument as to why there is no collateral estoppel with respect to the claim construction? Sure. And whether the prior art satisfied them without requiring claim construction? Yes. I think, in our brief, we talk about the differences between the 437 patent and the 144 patent. Isn't the phrase, though, identical in both the 437 and the 144, the without requiring file transfer enabling software to be loaded onto the user's computer? Yes. The without requiring language appears, but the rest of the claim language to which it refers is different. But I don't understand how that would make a difference in the context of whether the issues were really identical. So let me try to give an example. The 144 patent loses the concept of misidentification. It just says you send an identification parameter to identify the ADGPD. It doesn't say you identify it as a hard drive instead of as an ADGPD. And so in that instance, it is possible that you would send the hard drive identifier without requiring end user software because after all, then, the ADGPD is just properly identifying as the device class for which it belongs, the hard drive class, and it wouldn't need end user software to be loaded onto the host. So that's why the difference in the claim language matters here, because in one instance, you may be able to get away with it. I thought the whole argument in both the Canon IPR and the Samsung IPR is what is the role of cat sync, and is cat sync file transfer enabling software or not? That is. As that term is used in the claim, and that term is the same term that's used in both patents. Sure. It is used in both patents, but the claim construction that is applied over in the 144 patent, it wasn't necessarily the decision because in that particular patent, you didn't need to misidentify the device. So it is possible that you could use the customary driver and not have to resort to the use of end user software because it could identify itself as what it actually is, a hard drive. Whereas over here, it is different. There is this concept of misidentification. And so now you have to determine whether or not the cat sync driver can transfer files without requiring end user, or excuse me, whether the host device can obtain files from the cat sync, from the cat box without using the cat sync. And the answer is no. The file input output command is actually issued by the specialized cat sync driver. And as it relates to the 437 patent at issue here, that's actually outcome determinative because there's no way, there's nothing presented in ATAC for how the file input output command could be exercised without the cat sync driver. When I go back to your other argument against collateral estoppel, what I'll call your fairness, equity, and justice argument. And I think about Max Linear. Perhaps one distinction is that here we have all these cases that are scheduled for oral argument on the same day, whereas in Max Linear, yes, those were appeals from IPRs that were co-pending at the same time in front of the court. They were at different stages though, and then one matured earlier than the other and got a decision. And I'm just trying to understand why would it make a legal difference why in your case, given that all the oral arguments from the various IPRs were scheduled for the same day at this court, that that is an important distinction, a matter of applying collateral estoppel. Well, I think it is an important distinction, and perhaps I didn't articulate it well, but that was the point I was trying to make with the fact that this was consolidated for oral argument. That puts us more in line with the Cygnus case in which it was a multi-defendant litigation and the court found that that was one action. And so this wasn't consolidated for oral argument, was it? It was just scheduled on the same day. Okay. But yes, that's fair. But the point being, we were going to decide all the issues, we were going to argue all the issues on the same day here. And so I think it does put us more in line with the Cygnus case. I did want to reserve, I'm running up against my time limit, I did want to reserve at least a minute here for rebuttal. Well, I'm going to give you a couple of minutes for rebuttal, but why don't you spend a couple of minutes discussing, apart from collateral estoppel, what's wrong with the commission's decision? Thank you. What's wrong with the construction of the without requiring the termination of the conclusion of that decision? Thank you. Yes. So I think that, again, the main issue here is the interplay between the two limitations, the automatic recognition process and the automatic signaling limitations. And the ATAC cat box device is about as specialized of a device as you can imagine. It requires all kinds of drivers to be What about the claim construction? Is the claim, are you disputing the claim construction? Yes, but it may not matter. And so I'd rather What's wrong with the claim construction? The claim construction determined that without requiring meant not necessary as opposed to prohibited. And in my, the way I read these claims, I believe that the whole point of the 437 patent invention is to allow automatic file transfer and automatic recognition. And if you allow any type of software to be loaded on the host, whether it's required or not, you destroy the automatic principle of the invention. Because, after all, if someone does something, whether they need it to or not, the process is no longer automatic. That's it? Well, I mean, there's, there's case law that we cited, the Segan case, in which the court construed the without requiring language in a computer networking context, as opposed to what was done in the Celsus case, which was cited by the board. And they found that the without requiring language meant that you don't take some action, meaning if you do take some action, you have not met the claim language. And so they found that it was prohibited in the sense that their claim construction said that without requiring meant you don't do something. And so that is the legal position that we're taking, is that that is the appropriate definition for without requiring. But to be clear, under any definition of without requiring, the file input output command is being done by the CATSYNC driver, and ATAC affords no other possibility. It says that in the pseudocode And the board found to the contrary. And why isn't that finding supported on substantial evidence? Because there was no evidence for that. The only thing that was said was an inference in the petition. They cited to a conclusory testimony from petitioner's expert and a conclusory assertion in the petition, where the only reason why the, they found that the CATSYNC driver wasn't necessary is they said, well, if you removed it or weren't using it, you could default to using the ASPI driver for the file input output command, which is the customary driver. But that, there's never, that's never mentioned in the ATAC reference. It never says that you can remove it. And in fact, if you do remove the CATSYNC driver, you no longer have an interface device that's offerable because you lose all of the synchronization and coordination between the host computer and the processors of the cat box. And so they really, there was no evidence presented at all on that point. I guess the question is, is there a distinction between what is the software that's doing the function of reading and writing from the disk versus what is the function of coordinating different processors to access a given disk and the function of clearing a cache? And so, if you think perhaps more narrowly as to what is the function of the read write, maybe that did come from the SCSI drivers that are already on the PC. So I'd call the court's attention to the ATAC disclosure and the appendix 401 through 402 and it's lines 1063 through 11.5. And it actually says right there that the CATSYNC is directly involved in every file transfer. And it says that the CATSYNC hooks the file input output calls from the PC operating system and replaces it with the pseudocode. And what the pseudocode says, in addition to performing synchronization functionality and cache functionality, step four says make the intended file input output call. So the CATSYNC driver, this pseudocode of the CATSYNC driver is the driver that actually makes the file input output call. So it is clearly file transfer enabling software. It doesn't get more file transfer enabling than making the file input output. Right, but if we were to affirm the board's claim construction, then what that would mean is the claim should be understood as there can be software loaded on the user device, but nevertheless the system in the prior art can still perform the function of transferring a file without that software that has been, that specialized software that's been loaded onto the PC. So now we're living in this hypothetical world of looking at ATAC and trying to figure out, okay, could the ATAC PC make a read write call to the CAT disk without relying on the specialized software of CATSYNC? And the board appeared to make the call that, that there, that yes, it could. It wouldn't be reliable, as reliable as if ATAC had its CATSYNC software, but it could still be done. It would have to be done under, successfully probably under certain circumstances. Nothing in the cache, no CAT box isn't also trying to access the CAT disk at the same time, that sort of thing. But if you remove those circumstances, then you would have a, in the board's view, a clean opportunity for the SCSI driver to go get the file from the CAT disk. So two things. One, the ATAC reference never says anything about being able to remove CATSYNC. It says that CATSYNC does make the file input output call, and there's reasons for it, like we discussed, because of the synchronization. And so I don't think that it, under any claim construction, you, and it also, the other issue is, and this is something that I don't think the board addressed in any meaningful way, would a person of skill in the art be motivated to not, to remove the CATSYNC and destroy the functionality of the CAT box completely? I understand. That's a 103 argument. Here, we are looking at a different creature, and that's due to, perhaps, the way you drafted the claim with the without requiring language, and then once you construe that language, what that forces us to think about. And so it's not quite a motivation to modify the ATAC reference to yank out the CATSYNC, and then why would anybody do that? I think you've got a great argument that no one would want to do that, but that's not the exact, precise question we're confronted with right now. What we're confronted with is, is there substantial evidence to support the board's fact-finding that ATAC could work, could transfer a file to its PC without using CATSYNC? And I think the only way that that could work is if it was actually a hard drive, and that's all it was. So if you were doing standard SCSI signaling in which you ask a hard drive, not an interface device, but if all of the functionality of the CAT box goes away and we're saying we don't care about it, it's inoperable, and you only say, do an inquiry and say, what are you, and it actually is a hard drive, and then it signals back and says it is a hard drive, then the host, obviously, could treat it as a hard drive and use the ASPI drivers to communicate with it, but then it's no longer an interface device. It doesn't meet any of the other limitations, and so what they've basically done is just say that what they're really saying is standard SCSI signaling invalidates the patent because they've basically reduced the interface device to a hard drive and said if you send a signal and it just identifies as what it is, then you could use the standard driver. That's not the claim language. Okay. All right. I think we're out of time. We'll give you two minutes for the vote. Thank you. All right. May it please the court? The court should affirm the decision of the board. You're not claiming collateral estoppel at the claim level. You heard the exchange earlier. We are not claiming collateral estoppel at the claim level, Your Honor. We are not saying that because claim one of the 114 patent is unpatentable, ipso facto, claim one of the 437 is unpatentable. It's a subsidiary. Yes, PAPS really does misapprehend our argument. We are saying it's the subsidiary findings that are entitled to collateral estoppel effect, and we spelled it out in great detail in our brief, but of course you received a supplemental brief from PAPS on Tuesday, and with your permission, I wanted to focus more on responding to their particular arguments that they have made. So they've argued that in the 746, the patent, the automatic recognition process does not have the, without requiring any software limitation, therefore the factual findings with regard to that would not have been necessary to the judgment. That's incorrect for a few reasons. They're concentrating on the independent claims of the 746. If you go to claim 17, dependent claim 17 of the 746, there you do get a limitation of without requiring any software. That's more in connection with without requiring any software for file system information, but of course you would need that file system information to be able to later on read files from the system. Can I ask you this question? I guess I had taken it, and I'm not sure I understood everything, but I had taken on this patent, and sort of similar in the next case, that the principal distinction that PAPS was trying to argue was even at the issue level, there is an issue having to do with the automatic recognition here and the inquiry and response in the other one that wasn't decided in those other cases. Can you focus on that specifically, and then just in particular, does your argument that that's not really an issue here depend on your argument about waiver as to that recognition? It doesn't depend solely on that, Your Honor. We certainly say they forfeited all their arguments with regard to automatic recognition by not raising it in front of the board, but I think, Your Honor, what you may be getting at is that in claim one of the 437 patent, there's a limitation of without requiring loading any software in the automatic recognition process, whereas the without requiring limitation in the file transfer process is with regard to without requiring the loading of any file transfer enabling software, and there were necessary factual findings with regard to loading without loading any software for the automatic recognition process. In the 746 IPR on page 33 of that final written decision with regard to claim 17, there's the finding cat box responds automatically to the inquiry command and enables file transfer without the user loading any software, so that's in response to the inquiry command, so that's actually part of the recognition process. Further in that IPR at page 29, there's a factual finding. There's no evidence in the record that the cat sync driver, which is what they've been pointing to as special software, is needed for the inquiry read or write commands, and that really addresses all of their arguments with regard to both the two limitations as to whether special software is required, and those findings were necessary to the IPR decisions, Your Honors, so if we look at Graham against John Deere, it says that obviousness is a legal finding that's based upon subsidiary factual findings, and so the board is faced with these multiple inter partes reviews, and its task is to look at the prior art. What is the scope and content of ATAC plus the SCSI specification and the applicant admitted prior art, and their task is to figure out what does it do, and so they have issued a panoply of so they can then say that that is what was in the prior art. Now we're going to look at the smorgasbord of claims from all these patents and see whether or not the limitations of those claims are taught or suggested, and so their task required them to make all of these factual findings as to how ATAC really worked, and when you look at the argument, if they made some findings in, let's call it case number one, that turned out not to be necessary to the judgment, under standard collateral estoppel principles, those particular findings would not have collateral estoppel effect, if only because if that was the only thing wrong, nobody would appeal. Right, in the circumstance you asked, yes, only things that are necessary to the judgment in that particular case, but when they're faced, for example, with the limitations saying there should be, we're without requiring software to be loaded to get file system information, and they go and look at ATAC and they say, actually, no software is required to be loaded at all for anything with regard to recognition, file system information, or file transfer. That was a factual finding with regard to how the prior art actually worked, what the scope and content of the prior art was, and under Graham, it was the task assigned to them, so it was necessary to the judgment. That's the argument that we are making. Does your argument depend on that, that all findings they made about the prior art, even if some of those findings were not actually necessary to finding the claim elements met collateral estoppel, that seems a little strong? Even that's not necessary to argument, Your Honor, even if we were to say, only if you can tie a particular limitation to the one particular patent, and that limitation is not in another patent, we would still prevail because of the whole range of factual findings they have made that preclude the arguments that are being made in this particular case with regard to the 437 patent, which of course is very similar to the 144 in almost all of its elements. So, Your Honor, not only have they ignored the fact that the dependent claims in some of these they argue that, well, the 746 doesn't have a limitation without requiring any software, but if you look at the other patent, the 144, in the final written decision there, they did have to deal with it without requiring any software for the automatic recognition process, and there was a specific finding that on page 38 of the 144 final written decision, Petitioner further explains that there is no need for the end user to load any software onto the computer because the SCSI drivers that enable the host computer to access the simulated SCSI hard disk of the cat box would have been installed prior to the use of the computer. That factual finding answers their challenge to whether or not there should be estoppel with regard to this any software, or without requiring any software limitation. What about their alternative argument against collateral estoppel, the fairness, equity, justice, and the American way theory, where, I mean, I think what they're trying to say is maybe we should all take a big step back and see what's going on here, and all these patents have a common specification, so even though we would have multiple patents staring at us, we should maybe think of it as just one big omnibus patent with a lot of different claims, and now there's a class of petitioners, you and the 40 people sitting behind you, that are petitioning to attack various claims in this one omnibus patent, and it's all done in a coordinated fashion, and so all these proceedings are going through the board at essentially the same time, and then they're all to this court at the same time, a single morning of oral argument for all, and then somewhere along the line, the patent owner settles out with some of this class of petitioners. Would that be a circumstance where collateral estoppel ought to apply? Yes, your honor, and of course settlement was not the reason for this particular collateral estoppel problem. They chose to appeal from eight judgments that they have now voluntarily dismissed without getting any kind of a stipulation from us. They never even thought to ask for it. They forced us to go through briefing on everything. They forced for the briefs to be distributed to your honors. Fairness is more on our side. They knew full well the consequences of what they were doing. Just three years ago, the Supreme Court and B&B Hardware said that it's long-standing law that collateral estoppel applies to the decisions of Article I tribunals unless Congress expressly says otherwise, so this is not a secret, so it's quite fair for them to live with the consequences that were well known for their actions. Your honor, I should address, I suppose, the misidentification limitation. They strangely have said it's not part of the 144 application. 144 patent. Now, this is strange given that the opening statement is that misrepresenting is actually part of this invention. This goes back to your honors' prior decision in 2015 about the importance of mimicking in this. Did the board in either the 144 or the 746 make a finding about misidentification? It did not, your honor. I mean, then there's really not much of a launching pad about that to say that at the level of a finding, there was an earlier finding that creates collateral estoppel. Well, what's strange, your honor, is that they are arguing now that that is what is somehow missing from these limitations, and therefore there ought not be collateral estoppel. With regard to the 144 patent, if we go down to Claim 84 rather than Claim 1, there we have this exact limitation similar to the 437 patent, where the 437 patent, where they're saying it requires misidentification, is that it identifies as a digital storage device instead of as an ADGPD. Whereas in Claim 84 of the 144, it says parameters consistent with the ADGPD being a mass storage device. So there's the same kind of language they're calling out from the 144 as evoking. But to go back to where I think I started with you, am I right in understanding that you contend that misidentification was an issue forfeited in this proceeding, in the current proceeding? I do not recall them arguing that in the 437 IPR, your honor, so I think the answer would be yes if my memory is correct. I thought you said they made the argument in their preliminary response. The board, of course, when it institutes, always says nothing you said previously matters unless you repeat it, roughly speaking. They didn't repeat it. At the trial. That's my memory, your honor. Okay. But it's also in the record. You're urging us to find waiver here because you said that in the record. Yes, your honor, but now in their TAN brief of the other day, they're raising this issue of misidentification. No, I understand. And I really wanted to point out, if you look at the multiple occasions that in the ATAC device, the cat box is simulating and emulating a SCSI hard disk when in fact it is not. So even if we were to give credence to this misidentification idea, the factual findings that there is collateral estoppel effect too because the board had to identify what it is that ATAC identifies as to understand the prior art. The finding there is, it did, in fact, misidentify as being a SCSI hard disk rather than an ATA IDE hard disk, which is what it really is. But apart from collateral estoppel or waiver, that's what ATAC says. Yes, your honor, in column six of ATAC, yes. What about the part of ATAC bottom of column 10 that was the subject of some discussion mostly? This is the pseudo code issue, your honor. Yeah, about whether, you know, bottom of 10, you know, line 63 up to the top of column 11 that says we're basically going to replace the SCSI code with our own code in order to get at the cat disk. That's not quite accurate, your honor. If you look to step four of that pseudo code, it says make the intended file IO call one equals zero. That's just the SCSI code being sent through. That's not anything that's been altered, and that's further corroborated by column 12, where it talks about the the mass v-sys driver, which includes the SCSI ISR routine. This is the software that's... Is your description of what's happening in that little pseudo code description consistent with or contrary to what Mr. Gafford says? His name with it. Do you say that you had contrary testimony or that what you're saying is actually consistent with his description of that? It's consistent, your honor, in the sense that I don't believe there's any testimony from Mr. Gafford that the code was changed. It is just the SCSI language being used, even though there's this other software involved. Often, as Mr. Gafford testified, there is a circumstance that Judge Chen was talking about, where when you're merely using the cat box as a hard disk drive, you don't need the cat sync software. You can make reliable file calls. So is this an argument about, I think Judge Chen was maybe getting at this too, is this an argument about how the ATAC patent discussion of the cat box teaches one that one can do something that the cat box actually never ever does, or that sometimes the cat box does this, namely use SCSI code and only SCSI code to get at the cat disk? It's a situation where it can do that. And in fact, in column five of ATAC, it specifically says that the PC may not even have a hard disk. It can use the cat disk as a hard disk. So that's one of the intended purposes of ATAC. So there will be times when the cat box is just sitting there being used as a hard disk, and other times when it's getting all kinds of faxes coming out. When it is just sitting there being used as a hard disk, does ATAC say that this hooking process is not occurring? I didn't think it did ever say that, which is what left the document itself somewhat unclear. Right. I believe that. I believe, Your Honor, that was the testimony of the two experts, that that is what would occur in that situation where it isn't expressly discussed in the ATAC. And by the two experts, you mean that one... Dr. Reynolds on our side and Mr. Gafford on theirs. That paragraph that says you can't do it reliably without it, which maybe says that or maybe doesn't say that. Yes, it's circa 5960, I believe, of Mr. Gafford's declaration. Just so I'm following this conversation, my understanding was both experts agreed that the cat sync software is being used every single time, and so therefore you're going to hook that file call every single time. You know, maybe you don't need to do anything in terms of regulating other competing attempts to access the cat disk, because nothing else is trying to access that cat disk at that moment. But nevertheless, cat sync is involved in every file transfer. Am I misremembering the testimony? Your Honor, there was, I would say, contradictory testimony from Mr. Gafford on that point. He says that, and then he also says that cat sync is not required for the situation where it is only being used as a hard disk. My understanding of Dr. Reynolds' testimony was he agreed that cat sync is being used every single time. It's involved in every single file transfer, but the additional functionality being supplied by cat sync, in his view, is not necessary to do a successful file transfer. You could do a successful file transfer in ATAC without having cat sync loaded. I believe that's what he was trying to say, but as is, as disclosed in ATAC, yes, cat sync is being used every single time. The cat sync spec says so, Your Honor. As I said, I think there was some disagreement within Mr. Gafford's testimony. I'm talking about Dr. Reynolds' testimony. Yes, yes, yes. ATAC says it, and I believe Dr. Reynolds agrees with that. What he says is, hypothetically, if it weren't there, you would get the same result because it would default to LUN equals zero, which is exactly what step four in the pseudocode does with cat sync. That's why he says it's not necessary and why it's not file transfer enabling software. Okay, all right. Thank you. Thank you, Mr. Gallagher. Mr. Gallagher, you've got two minutes. So it looks like I only have a few minutes, but let me just start with the issue of Dependent Claim 17 of the 746 patent where opposing counsel asserts that it actually discloses end-user software being used for identification. That claim actually says the analog data acquisition device of Claim 1 wherein the processor is configured to cause acquired analog data file system information to be sent, and then it says without requiring after reciting the previously recited multipurpose interface parameter being sent. So it actually refers to the end-user software requirement, the without requiring end-user software refers to the data file system information to be sent, and it has nothing to do with the automatic recognition. The other issue, and I think that it's worth it. Did you waive the automatic recognition argument by not raising it in your patent owner response? No, Your Honor. I believe we did raise it, and that's why there is no waiver. I think if you look at the appendix, pages 2217 through 2222, I think, we talk about 2217 through actually 2223. There's a section entitled ATAC cannot support an obviousness conclusion for the 437 patent, and then there's two subsections, one and two. One of them says ATAC intended CatBox to be a multitasking device to solve the problem of integrating operation of multiple devices with a PC, and in that section we talk about how ATAC is actually more than just a hard drive. It's all of these other devices with these other functionalities, and the purpose of... What about the automatic file transfer function? What about the automatic recognition? Yes, well, so it's informative, I think, to look at how they pled the automatic recognition limitation in their petition. What they said, and this is on page 161 of the appendix, their petition, they basically, the only thing they said is for automatic recognition to occur. ATAC doesn't say anything about the inquiry or the response, but we're going to infer that the automatic recognition occurs because the CatBox looks like a cat drive or a hard drive from the perspective of the host, and in this section that I'm referring to, we're saying back to them, well, wait a minute, it actually looks like a lot of other devices, too. That inference that the CatBox would identify as a hard drive doesn't make sense because the CatBox isn't just a hard drive, it's all of these other devices, and so this argument in this section is it's actually because of the interplay between the file transfer and the automatic recognition limitations is actually applicable to both because in the file transfer limitation they say, they make the same hard drive that you both would recognize it, a parameter would be sent to recognize it, and then the file would consequently be transferred using the customary driver. And so I think, and if you look at the appendix, page 2237, it's pretty clear that there's two independent claims in this patent, Your Honor, and on the page 2237, there's a reference to independent claim 43, which is also an issue here, and if you look at on that page, it explicitly recites that we're contending that the automatic recognition limitation is not obvious in conjunction with the file transfer limitation. So it's pretty clear that for independent claim 43, and it refers to the sections of the brief, sections three through six, that both for claim one and for claim 43, we are making arguments related to the automatic recognition process, and the specific argument we're making is that your inference can't work, it doesn't work, you can't say that you infer that the cat box would send a hard drive identifier to the host simply because the host looks, from the host perspective, the cat box looks like a hard drive because it also looks like all of these other devices, so why wouldn't an identifier be sent that would identify it as a printer or some other device? And in fact, what we're saying here is that wouldn't happen. SCSI actually has a 1FH command that can be sent for a quirky device like cat box, an unknown identifier that would allow it to identify and then use... Where did you say 1FH in your patent owner response? That is not in there, Your Honor, but it's, to be clear, that's mainly for the court's edification because you might be curious, well look, if a device like cat box does not send a hard drive identifier, what does it send? And the we don't need to find that here today, that's not part of the claim limitation, we just need to find they didn't meet their burden to show that it sends a hard drive identifier, and that's because their inference that a hard drive identifier would be sent when you're dealing with a cat box device to identify a cat box device that looks like all of these other devices just doesn't make sense. In fact... I think we're out of time. Okay. Thank you, Mr. Connelly. Thank both counsels.